IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA ROSS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:18-cv-537-RAH-JTA |
| | ) | |
| SEJIN AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| JESSICA ROSS and LaEBBOINE RUSSELL, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:18-cv-734-RAH-JTA |
| | ) | |
| SEJIN AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

Plaintiffs Jessica Ross, Naquita Bledsoe, Latoya Pearson and LaEbbonie Russell

filed this employment discrimination action against their former employer, Sejin America,

Inc., alleging racial discrimination under Title VII of the Civil Rights Act, as amended (42

U.S.C. § 2000e, *et seq*.), and 42 U.S.C. § 1981.  (Doc. No. 1.)  All plaintiffs are proceeding

*pro se*.   This action was referred to the undersigned for further proceedings and

determination or recommendation as may be appropriate pursuant to 28 U.S.C. § 636.

(Doc. No. 92.)

This matter is before the undersigned on Sejin's Motions for Summary Judgment with evidentiary submissions and briefs in support thereof against Bledsoe (Docs. No. 148, 149, 156), Pearson (Docs. No 150, 151, 157), Ross (Docs. No. 152, 153, 158) and Russell (Docs. No. 154, 155, 159).   Each plaintiff filed a Motion in Opposition to Summary Judgment with supporting briefs and evidentiary submissions.  (Docs. No. 160, 161, 162 (Bledsoe); Docs. No. 163, 173, 174 (Ross); Docs. No. 166, 167, 168 (Pearson); and Docs. No. 169, 175, 176 (Russell).)  The undersigned construes these filings as responses in opposition to summary judgment.[1]  Sejin filed replies to the responses from Ross (Doc. No. 177) and Russell (Doc. No. 180).

Also, before the court is Sejin's Motion to Strike, or in the Alternative, Notice of Objections against Plaintiff Ross.  (Doc. No. 178.)  An Objection by Plaintiff Ross followed (Doc. No. 185), as did Sejin's Reply (Doc. No. 192) and Ross' Surreply (Doc. No. 198).  Similarly, Sejin filed a Notice of Objections, or in the Alternative, Motion to Strike against Russell.  (Doc. No. 181).  Russell filed an Objection (Doc. No. 186), which was followed by Sejin's Reply (Doc. No. 191) and Russell's Surreply (Doc. No. 197).

All motions are ripe for review.

---

[1] Each "motion in opposition" asserts that summary judgment in favor of Sejin is not warranted because the filing plaintiff has demonstrated a genuine issue of material fact as to her claims and "establish[ed] a prima facie claim of race or national origin [discrimination] under Title VII of the Civil Rights Act or Section 1981."  (Doc. No. 160 at 1; Doc. No. 163 at 1; Doc. No. 166 at 1; Doc. No. 169 at 1.)  The corresponding briefs in opposition conclude with a request that Sejin's motions for summary judgment be denied.  (Doc. No. 161 at 39; Doc. No. 167 at 54; Doc. No. 173 at 24; Doc. No. 175 at 36.)  Hence, these documents, though labeled as "motions," are not motions as the plaintiffs are not moving for summary judgment in their favor.

After careful review, the undersigned concludes that the motions for summary judgment and motions to strike are due to be GRANTED.

## I.    SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one "that might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. The moving party "has the burden of either negating an essential element of the nonmoving party's case or showing that there is no evidence to prove a fact necessary to the nonmoving party's case." *McGee v. Sentinel Offender Servs., LLC,* 719 F.3d 1236, 1242 (11th Cir. 2013).

If the moving party meets its burden, the nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Factual assertions must cite to specific materials in the record, including affidavits, depositions, declarations, and interrogatory answers. Fed. R. Civ. P. 56(c). Unsupported conclusions and factual allegations are insufficient to create a genuine issue of material fact. *Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005). Also insufficient are allegations based on speculation. *Cordoba v. Dillard's, Inc*., 419 F.3d 1169, 1181 (11th

Cir. 2005).  *See also Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1996) ("[U]nsubstantiated assertions alone are not enough to withstand a motion for summary judgment.").  Finally, "the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact." *Anderson*, 477 U.S. at 247–248.  In reviewing a motion for summary judgment, a court must "view the evidence in the light most favorable to the non-moving party and resolve all reasonable doubts about the facts in favor of the non-movant." *Kroma Makeup EU, LLC v. Boldface Licensing + Branding, Inc.*, 920 F.3d 704, 707 (11th Cir. 2019).

## II.    FACTUAL BACKGROUND[2] AND PROCEDURAL HISTORY

### A.    Plaintiffs' Employment

The plaintiffs are African-American females who were employed by Sejin in Dadeville, Alabama.  Sejin manufactures plastic automobile parts for Hyundai Motor Manufacturing Alabama and Kia Motor Manufacturing Georgia.  (Doc. No. 153-11 at 2, ¶ 2.)  The facts related to the plaintiffs' claims are set forth below.

---

[2] The undersigned has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including the plaintiffs' deposition transcripts (Doc. No. 149-1; Doc. No. 151-1; Doc. No. 153-1; Doc. No. 155-1).  All plaintiffs were deposed prior to March 8, 2021, the discovery cutoff date.  (Doc. No. 69 at 2, ¶ 7.)  The undersigned has also reviewed declarations from and deposition transcripts of current and former Sejin employees, including Patrick Bailey (Doc. No. 153-10; Doc. No. 165-15), Reid Davenport (Doc. No. 153-12; Doc. No. 165-16),  Jong Hyun Paek (Doc. No. 153-11) and Michael Ransaw (Doc. No. 165-14).  As the court must when ruling on a motion for summary judgment, the undersigned views this evidence in the light most favorable to the plaintiffs and draws all justifiable inferences in their favor.  *Anderson*, 477 U.S. at 255.

Jessica Ross

Ross was hired as an accounting administrative assistant and hourly employee at Sejin in November 2013.  (Ross Dep. Tr. at 39.)  As an hourly employee, she understood that she was subject to Sejin's Team Member Handbook which set forth the company's rules on attendance, leave, and calculation of wages based upon time clocked at the beginning and end of her work shifts.  (*Id*. at 63-64, 71.)

While at Sejin, Ross' requests for two lateral transfers were granted and she was later promoted to team leader.  (*Id*. at 45-46, 53-54.)  Her applications for positions as assistant production manager, human resources coordinator and human resources supervisor were unsuccessful, though she turned down a promotion to a supervisory position.  (*Id*. at 56-57, 86.)  When Ross was required to work through her lunch hour she was paid for the extra time she was on the clock.  (*Id*. at 57-58.)  She never received any warnings regarding her compliance with Sejin's attendance policies and all of her requests for leave were granted.  (*Id*. at 65, 72, 76-77.)  On one occasion, a Korean supervisor in the accounting department granted Ross' request for leave to attend her child's school function but threw the folder containing the leave request at her.  (*Id*. at 100-01; Doc. No. 174-8.)  Ross reported the incident and was allowed to transfer from the accounting department to the manufacturing department.  (Ross Dep. Tr. at 101-02.)

Ross was a manufacturing team leader when Sejin laid her off as part of a staff reduction in October 2017.  (*Id*. at 78-79.)  She was called back to work to fill an assembly position in February 2018.  (*Id*. at 16, 81.)  Shortly thereafter, in March 2018, Ross resigned from Sejin for other employment.  (*Id*. at 16.)

According to Ross, hourly Korean employees were not subject to the attendance policies in the Handbook.  She identified an hourly Korean female employee, Mikyeong Kweon, who returned late from lunch numerous times.[3]  Ross believed Kweon was not subject to the hourly attendance policy because Ross had no knowledge of Kweon being disciplined pursuant to the Handbook.  (*Id*. at 70-72.)  Even though Kweon and Ross were both assistants, Ross was required to report to her as a supervisor.  (*Id*. at 69.)  Ross opined Sejin's position classifications were "not real defined" and regarded them as "kind of sketchy."  (*Id*.)  Ross identified Soo Hwa Kim as another Korean employee who had "attendance issues being late [and] leaving early" and was not subject to Sejin's attendance policies.  (*Id*. at 92-93.)  Ross did not know whether Kim was paid as a salaried or hourly employee.[4]  (*Id*. at 93.)  Ross also saw Sejin's Korean interns "constantly coming late" and knew them to be hourly employees who were not subject to the company's leave policies.[5]  (*Id*. at 96-97.)    Finally, Ross identified Kay Song ("Song") as another Korean administrative assistant who was "always back and forth between buildings."  (*Id*. at 105-06.)  Ross believed that Song was an hourly employee but she did not know whether Song was in fact leaving work or going to work in a different building.  (*Id*.)

---

[3]  Kweon was laid off in October 2017 and was not called back to work by Sejin.  (Ross Dep. Tr. at 82-83.)

[4] Kim is a Chinese woman whose real name is Xiuhua Jin.  She used the Korean name "Soo Hwa Kim" at Sejin and was a salaried team member throughout her employment at the company.  (Doc. No. 153-10 at 6, ¶14.)

[5] According to Human Resources Manager Jong Hyun Paek, interns "were not subject to the same rules or policies as Sejin's hourly or salaried employees."  (Doc. No. 153-11 at 5, ¶14.)

Ross surmised that Sejin maintained separate systems of wage calculations for Black and Asian employees because "[m]any of the Koreans didn't start clocking in until approximately three years after [she] got there." (*Id*. at 107.) Ross had no explanation for how she was damaged by Sejin's different systems of time calculation and generally believed the company permitted its Korean employees to return late from lunch and leave early. (*Id*. at 111-12.) Regarding her knowledge of Korean and Asian employees' movements and schedules, she conceded "maybe they just didn't let me know because I'm hourly." (*Id*. at 112-13.)

<u>Naquita Bledsoe</u>

Bledsoe began her employment as an administrative clerk in Sejin's Manufacturing and Engineering department in August 2014. (Bledsoe Dep. Tr. at 10, 13, 32.) Her duties included monitoring attendance of production employees, conducting orientation for new employees, and ordering supplies. (*Id*. at 36-38.) She received a copy of the Handbook and understood that she was an hourly team member who was required to clock in at 8:00 a.m. and out at 5:00 p.m., with a one hour lunch break. (*Id*. at 25-26.) She sometimes had to work past 5:00 p.m. and could not remember whether she was paid for the extra time, though she did not articulate any reason to believe that she was not paid appropriately. (*Id*. at 26-27.) Bledsoe never received any discipline or notice that she violated Sejin's attendance policy. (*Id*. at 27, 50.) Although Bledsoe never requested a pay increase and did not apply for additional positions at the company, she received a pay increase and was promoted to a team leader administrative assistant in February 2016. (*Id*. at 57.) At some point, Bledsoe made a complaint through her supervisor but could not remember why she

complained.  (*Id*. at 40-41, 58.)  She received approval for several requests for paid time off during her employment with Sejin.  (*Id*. at 42-56.)  Bledsoe resigned from her position at Sejin on May 4, 2016.  (Doc. No. 149-6 at 22.)  Her resignation letter stated that her work at Sejin was a rewarding experience for which she was grateful.  (*Id*., Bledsoe Dep. Tr. at 62-63.)

Latoya Pearson

Pearson began working at Sejin through a temporary employment agency in August 2015 and became a Sejin employee in November 2015.  (Pearson Dep. Tr. at 15-16, 37-38.)  She was a safety/general affairs assistant throughout her tenure and did not apply for any other position with the company.  (*Id*. at 40-42, 63, 65.)  Though Pearson received the Handbook and understood that it applied to her as an hourly employee, she had no recollection of its contents.  (*Id*. at 70, 120-21.)  Because Pearson's duties included serving tea and food to management, she sometimes had to forfeit her lunch hour when the food she was serving arrived late.  (*Id*. at 46, 66-67.)  Her requests to take a longer lunch on these occasions were denied.  (*Id*. at 67-69.)  Pearson generally worked forty hours per week and was occasionally required to work overtime.  (*Id*. at 69-70.)

According to Pearson, she was not fully paid by Sejin, though she was uncertain whether Korean or Asian employees were paid more for their work, or whether the company maintained separate policies for leave eligibility and disciplinary points for those employees.  (*Id*. at 105-110.)  Pearson believed that Korean employees did not clock in or out, and enjoyed better wages and favorable treatment under Sejin's leave policies.  (*Id*. at

122-23, 136-38.)  Pearson left Sejin in November 2016 for other employment.  (*Id*. at 15, 19-20.)

LaEbbonie Russell

Russell began work in August 2015 as an administrative assistant in Sejin's Manufacturing and Engineering department.  (Russell Dep. Tr. at 12-13, 50, 53.)  She received a copy of the Handbook and understood that it applied to her as an hourly employee.  (*Id*. at 46-47, 57.)  Russell worked between the hours of 8:00 a.m. and 5:00 p.m. with a one-hour lunch break.  (*Id*. at 59, 82-83.)  She was laid off in October 2017 and was recalled as an assembly line employee in February 2018.  (*Id*. at 86, 107, 109-110.)  On or about February 27, 2018, Russell took a leave of absence under the Family and Medical Leave Act.  (*Id*. at 113-14.)  Due to Russell's failure to provide required documentation of her medical status and leave eligibility, Sejin notified her that her absences exceeded those allowed by Sejin and terminated her as of April 24, 2018.  (Doc. No. 155-3 at 2-3.)

Russell does not remember how many paid vacation days or days off with pay she received while at Sejin (*id*. at 73, 75-76), or whether she was disciplined for violating Sejin's attendance policy (i*d*. at 76, 83-84).  Russell cannot say whether Sejin calculated her "actual hours worked in a way that resulted in lesser wages." (*Id*. at 58-59.)  Russell believed however that Korean or Asian employees were paid for more than their actual hours worked and were disciplined less frequently than her. (*Id*. at 62-63.)  Russell further believed that Korean or Asian employees received paid vacation time prior to completing a year of employment at Sejin, and were "given more leeway with vacation" and time off,

both paid and unpaid.  (*Id*. at 65, 77, 94-96, 99-100.)  Yet, Russell cannot recall the names, gender, or pay status of any employees who enjoyed this favorable treatment.  (*Id*. at 77.)

Sejin's Policies

Jong Hyun Paek was the Human Resources Manager at Sejin during the plaintiffs' employment.  (Doc. No. 153-11 at 2, ¶ 1.)  During that time, Sejin distributed its Handbook to all new employees who were in turn required to review and acknowledge the policies set forth therein.  (*Id*. at ¶ 4.)  Pursuant to Sejin's policy, the Handbook applied to all hourly employees in matters of attendance, leave eligibility and wage calculation.  (*Id*. at ¶ 5.) Salaried employees are not subject to the Handbook.[6]  (*Id*. at 3, ¶ 5.b.)  According to Paek, it was Sejin's policy to provide or deny its hourly team members leaves of absence such as non-paid time off and paid time off based on "eligibility as provided under the Handbook and not on the basis of their race, ethnicity or national origin."  (*Id*. at 3, ¶ 7.)  Hourly team members were eligible for forty (40) hours of vacation upon completion of one year of employment and eighty (80) hours after two years.  (*Id*.)  Sejin's policy was to pay all employees for actual hours worked and properly recorded in its time clock system as all hourly employees must clock in and out when entering or leaving the facility.  (*Id*. at 3, ¶ 8.)  Sejin's timeclock rounded employee punch times to the nearest fifteen (15) minutes

---

[6] It is disputed as to whether the Handbook applied to salaried employees as Michael Ransaw, a former salaried employee at Sejin, testified that salaried employees received the same Handbook as hourly employees and "probably had to adhere to the [H]andbook."  (Ransaw Dep. Tr. at 59.) Reid Davenport, a Human Resources Manager, testified that the Handbook for the salaried employees was the same as the one for the hourly employees.  (Davenport Dep. Tr. at 40-41.) Davenport elucidated that the attendance policy for hourly employees did not apply to salaried employees.  (*Id*. at 41.)

except during the fifteen minutes before or after an employee's shift.  In those instances, the clock rounded to the time the employee's shift is scheduled to begin or end.  (*Id.* at 3, ¶ 8.a.)  If a supervisor or manager authorized an employee to begin work early, the clock rounded to the nearest fifteen minutes so that the employee was properly compensated for their work.  (*Id.* at 4, ¶ 8.b.)  Sejin assigned some employees to review others' hourly clock punches to ensure that wages were correctly paid.  (*Id.* at 4, ¶ 8.c.)  During the time the plaintiffs worked at Sejin, no Korean hourly employees performed tasks similar to them. (*Id.* at 4,¶ 11.)

Patrick Bailey is a Human Resources Assistant Manager at Sejin.[7]  (Doc. No. 153-10 at 2, ¶ 2.)  According to Bailey's review of the plaintiffs' personnel information, Russell received a warning or discipline for exceeding the number of available attendance credits or points allowed under Sejin's attendance policy.  (*Id.* at 5, ¶¶ 13, 14.a-b.)  Attendance points have no impact on an employee's pay or eligibility for pay raises from Sejin. (*Id.* at ¶ 14.c.)

In addition to employing both hourly and salaried workers, Sejin operates an intern program at its Dadeville facility.  (Doc. No. 153-11 at 5, ¶ 15.)  Sejin interns are not subject to the same policies as its hourly or salaried employees.  (*Id.*)

---

[7] Notably, Bailey testified that salaried employees received the same Handbook as hourly employees, but the vacation and leave rules for the hourly and salaried employees were not the same.  (Bailey Dep. Tr. at 17.)

B.      Plaintiffs' Complaints

Plaintiffs filed their Complaint against Sejin through counsel on May 25, 2018. (Doc. No. 1.) This initial Complaint attached a copy of a Dismissal and Notice of Rights letter issued to each plaintiff by the Equal Employment Opportunity Commission on February 23, 2018.   (Doc. No. 1-1.)   Count One of the Complaint alleged race discrimination, in violation of Title VII and 42 U.S.C. §§ 1981 and 1981(a).   Count Two alleged a cold and hostile working environment based upon race, sex, and national origin, in violation of Title VII.   On August 15, 2018, Ross and Russell filed a separate action against Sejin in which Ross alleged (1) sexual harassment, (2) a retaliatory and hostile work environment, (3) negligent infliction of emotional distress, and (4) negligent hiring, retention and supervision of employees. *See* Doc. No. 1, *Ross, et al. v. Sejin*, 3:18-cv-734-RAH-JTA.   Russell alleged a single claim of wrongful termination and discharge. *Id*. Pursuant to this court's orders, Plaintiffs filed three amended versions of their original Complaint. (*See* Docs. No. 25, 27, 29.) On July 15, 2019, this court ordered them to file another complaint and consolidated the Ross/Russell Complaint for all further proceedings. (Doc. No. 39.)

Plaintiffs' Fourth Amended Complaint presented one claim of disparate treatment due to race/national origin by all plaintiffs, in violation of Title VII and 42 U.S.C. § 1981 in Count One.  (Doc. No. 40 at 6-9.)   The remaining five claims by the plaintiffs alleged race discrimination (Ross - Count Two, *id*. at 9-12); hostile work environment based on race (Pearson – Count Three, *id*. at 12-15); retaliation discrimination (Russell – Count

Four, *id*. at 15-18); sexual harassment and retaliation (Ross – Count Five, *id*. at 18-20); and outrage/intentional infliction of emotional distress (Ross – Count Six, *id*. at 20-23).

Sejin filed a Motion to Dismiss Plaintiffs' Fourth Amended Complaint (Doc. No. 42), asserting that plaintiffs had failed to state a claim upon which relief could be granted. In a Memorandum Opinion and Order issued on March 2, 2020, the court determined that Plaintiffs' sole viable count was Count One.   (Doc. No. 51 at 18-19.)   That count alleges that Sejin violated Title VII and 42 U.S.C. § 1981 through its disparate treatment of plaintiffs, based upon race and national origin, by

> treat[ing] [the African American plaintiffs] differently than its Asian/Korean employees by (1) awarding Plaintiffs more points for the same violations under its attendance policy, which caused Plaintiffs to be more frequently disciplined, (2) calculating Plaintiffs' actual hours worked in a way that resulted in lesser wages, and (3) awarding Plaintiffs leave eligibility after a longer period of employment.  (Doc. 40, ¶¶ 21-29).

(Doc. No. 51 at 3-4.)

With the remaining claims thus defined, the undersigned must now determine whether plaintiffs can survive Sejin's motions for summary judgment regarding the application of its disciplinary point system, wage calculation methods and leave eligibility criteria.[8]

---

[8] The court did not include the plaintiffs' claims under § 1981 in ruling that their Title VII claims stated in Count One were viable.  (Doc. No. 51 at 18-19, ¶¶ 2, 9.)  However, because the court did not specifically rule that the § 1981 claims stated in Count One were dismissed, they are analyzed herein with the Title VII claims for purposes of summary judgment.

C.     Motions for Summary Judgment

Sejin argues that it is entitled to summary judgment against the claims alleged by the plaintiffs because none has established a *prima facie* case of race or national origin discrimination by demonstrating (1) that they were subject to an adverse employment action related to their attendance, time off, or wage calculation, or (2) that a similarly situated Korean or Asian hourly employee was treated more favorably.  (Doc. No. 156 at 15; Doc. No. 157 at 15-16; Doc. No. 158 at 15-16; Doc. No. 159 at 15-16.)

The plaintiffs respond that they suffered a qualifying adverse employment action.[9] (Doc. No. 161 at 39; Doc. No. 167 at 54; Doc. No. 173 at 23-24; Doc. No. 175 at 35-36.) They also contend that Sejin should be denied summary judgment because their evidence shows inconsistencies in the company's attendance point system and wage/leave calculations that were advantageous to its Korean or Asian employees.  (Doc. No. 161 at 34-38; Doc. No. 167 at 50-53; Doc. No. 173 at 16-23; Doc. No. 175 at 35.)

## III.   JURISDICTION AND VENUE

This court exercises subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.  The parties do not contest personal jurisdiction or venue, and the undersigned finds sufficient allegations to support both in the Middle District of Alabama.

---

[9] Shortly after the court ruled on Sejin's Motion to Dismiss, the plaintiffs undertook their own representation.

## IV.    DISCUSSION

A.    Sejin's Motions to Strike, or in the Alternative, Notices of Objection

As a preliminary matter, Sejin has filed companion motions to strike, or alternatively, lodges objections to several evidentiary submissions from Ross (Doc. No. 174) and Russell (Doc. No. 176) in support of their responses opposing summary judgment. Sejin first moves to strike Exhibits B-L submitted by Ross on grounds that she failed to timely disclose the exhibits in accordance with Federal Rule of Civil Procedure 26(a)(1). (Doc. No. 178 at 2.)   Alternatively, Sejin argues that the exhibits are irrelevant and/or immaterial under Federal Rule of Evidence 401; not authenticated and unable to be authenticated at trial pursuant to Federal Rule of Evidence 901; conclusory, speculative, and/or opinion evidence lacking foundation; and made without personal knowledge as required by Federal Rule of Civil Procedure 56(c)(4).   (*Id.* at 2-3.)   The Ross exhibits at issue are:

> B – Hyun Doug "Sean" Rhee's timesheet
> C – HR Received Document Log
> D – Ain Hyun Yoo timesheet
> E – Jessica Ross timesheet
> F – Kyung Ja Choi timesheet
> G – In Sook Paek timesheet
> H – Incident Report regarding IW Kim
> I – Email verifying Ross updated supervisory report
> J – Indeed job application status report
> K – Sungrye Paek timesheet
> L – Affidavit of Marquita Johnson

(Doc. No. 174 at 1.)

Likewise, Sejin asserts untimely disclosure as grounds for striking Exhibits A, C-G and I filed by Russell.[10]  (Doc. No. 181 at 2-3.)  Sejin also seeks to strike Russell's exhibits H, J, K, and N as irrelevant.  (*Id.* at 6-11.)  Finally, Sejin submits that the Affidavit of Marquita Johnson (submitted by Ross as Exhibit L and by Russell as Exhibit O) should be stricken because it is irrelevant and contains inadmissible speculation.  (Doc. No. 178 at 9-13; Doc. No. 181 at 11-14.)  The Russell exhibits at issue are:

> A – Russell Time Off Request Sheets
> C – Hyun Doug Ree Timesheet
> D – Ain Hyun Yoo Timesheet
> E – Kyung Ja Choi Timesheet
> F – In Sook Paek Timesheet
> G – Russell Timesheet
> H – Russell Offer of Employment
> I – Russell Job Description
> J – Russell Write-Up for Disturbance
> K – Russell Write-Up for Errors – Job Performance
> N – Russell Timeoff Request Sheet
> O – Marquita Johnson Affidavit

(Doc. No. 176-1.)

The undersigned addresses Sejin's arguments below.

1.      Failure to Timely Disclose

Sejin's primary opposition to Ross Exhibits B through K and Russell Exhibits A, C-G and I is the late disclosure of the documents on April 20, 2021, six weeks after discovery concluded on March 8, 2021.  (Doc. No. 178 at 3; Doc. No. 181 at 3-4.)  Sejin argues the court granted additional time for plaintiffs to complete depositions but that no other discovery deadlines were extended.  (Doc. No. 113, Order of April 13, 2021; Doc. No. 178

---

[10]  Russell's Exhibits C-F are duplicates of Ross' Exhibits B, D, F and G.

at 3, n.7; Doc. No. 181 at 4, n.8.)  Sejin further argues that the documents have been in the plaintiffs' possession since at least April 2018, the last month it employed Russell, the final plaintiff to leave its payroll.  (Doc. No. 178 at 4, Doc. No. 181 at 4.)  Under this timeline, Sejin contends the documents should have been produced before the close of discovery. (Doc. No. 178 at 3-4; Doc. No. 181 at 3-4.)

Federal Rule of Civil Procedure 26 provides that

a party must, without awaiting a discovery request, provide to the other parties a copy – or a description by category and location – of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.

Fed. R. Civ. P. 26(a)(1)(ii).  Under Rule 26(a)(1)(ii), all plaintiffs were required to provide to Sejin any document that they possessed that may be used to support their claims or defenses.  The Eleventh Circuit has held that Rule 26(e) requires that parties supplement their discovery responses and disclosures "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing."  *King v. Passmore*, Case No. 2:16-cv-192-JEO, 2017 WL 5202996, at *2 (N.D. Ala. Apr. 17, 2017) (quoting *Mee Indus. v. Dow Chem. Co.*, 608 F.3d 1202, 1221 (11th Cir. 2010)).  Moreover, Federal Rule of Civil Procedure 37 provides in pertinent part,

[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.

Fed. R. Civ. P. 37(c).  The party failing to comply with the disclosures required under Rule 26(a) bears the burden of establishing that its non-disclosure was either substantially

justified or harmless. *King,* 2017 WL 5202996, at *2 (quoting *Hewitt v. Liberty Mut. Grp., Inc.*, 268 F.R.D. 681, 682-83 (M.D. Fla. 2010)); *see also Little v. City of Anniston*, Case No. 1:15-CV-954-VEH, 2016 WL 7407093, at *2 (N.D. Ala. Dec. 22, 2016) ("The burden of establishing that a failure to disclose was substantially justified or harmless rests on the nondisclosing party.")

Here, the plaintiffs attempt to meet their burden by arguing that the documents were in a storage facility leased by Russell but were inaccessible due to a lien placed on her belongings.[11] (Doc. No. 185 at 2; Doc. No. 186 at 2.) They contend that Sejin was "made fully aware of this issue" on April 21, 2021. (*Id.*) Plaintiffs suggest that Sejin seeks to exclude the documents because they would validate the plaintiffs' claims of discrimination against employees who were not Korean or Asian. (*Id.*)

Plaintiffs' attempt to justify the late disclosure due to inaccessibility is unavailing. While Russell argues that she "had no knowledge of every detailed item kept in the storage unit," the undersigned disbelieves that she had no knowledge of the documents that she had collected which included her timesheets, the timesheets for Ross, and the timesheets for other Sejin employees. (Doc. No. 197 at 2.) Even if the documents were unavailable for production prior to the close of discovery, Plaintiffs were required to "at least identify" the documents "to avoid surprise and minimize prejudice." *Little,* 2016 WL 7407093 at *4 (citing *Cash v. State Farm Fire & Cas. Co.*, 125 F. Supp. 2d 474, 477 (M.D. Ala. 2000)). In *Little*, the plaintiff attempted to justify his failure to alert defendants of his intent to use

---

[11] Russell has submitted documentation that she lost access to the storage unit where the exhibits were kept in January 2018. (Doc. No. 186-1.)

documents in their possession.  The district court found this unacceptable under Rule 26(a) because even identifying the documents would have allowed the defendants to conduct "further investigation, preparation, and discovery with regards to the Plaintiff's anticipated use of these documents."  *Little*, *id*.  Such is the case here.  Plaintiffs' failure to disclose or identify the exhibits was not substantially justified.

Moreover, Ross and Russell have not shown how their failure to disclose the exhibits at issue was harmless.  Sejin received the documents after discovery had closed and thus were unable to investigate the exhibits, depose the plaintiffs as to their retention of the exhibits or the original source, or even obtain context on the exhibits.  Use of these exhibits for summary judgment purposes, where evidence is viewed in the light most favorable to the plaintiffs, certainly harms Sejin and the plaintiffs have not shown otherwise.

Accordingly, neither Ross nor Russell have met their burdens under Rule 37(c) of establishing that their failure to disclose the exhibits at issue was substantially justified or harmless.  Sejin's motions to strike these exhibits are due to be granted.

2.    Relevance

Sejin seeks to strike Russell's Exhibits H, J, K and N as irrelevant and immaterial under Federal Rule of Evidence 401.  (Doc. No. 181 at 6.)  The documents at issue are Russell's offer of employment from Sejin, her write-up for disturbance[12] while on duty at

---

[12] Russell was accused of "causing a disturbance and creating a hostile work environment as well as using profanity against a team member."  (Doc. No. 176-10.)

Sejin, her write-up for errors[13] while on duty at Sejin, and an approved time off request. (Doc. No. 176.) Sejin argues that Russell's employment documents have no bearing upon the issues before the court – namely, whether Sejin discriminated against her in matters related to attendance points, wage calculation, or leave availability. (Doc. No. 181 at 9-10.)

Russell argues in response that the documents respectively show that she held the same position as Korean hourly employees, managed an expanding list of job responsibilities, Sejin attempted to create a justifiable reason to terminate her because she voiced dissatisfaction with unfair treatment in the workplace and Sejin assigned her an attendance point even though her leave was approved. (Doc. No. 197 at 5-7.)

The court agrees with Sejin. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." F.R.E. 401. Even though Exhibit N clearly relates to leave requested by Russell, it does not show that she was disciplined under Sejin's attendance point system or that the approval of the leave was discriminatory in any way. (Doc. No. 181 at 10.) Exhibits H, J, and K are plainly irrelevant to Russell's claims because they do not relate to discrimination in the attendance point system, wage calculation, or leave availability. Accordingly, Sejin's motion to strike these exhibits is due to be granted.

---

[13] Russell's infraction was "for her performance as time keeper" as the "Human Resources Department . . . brought to [Sejin's] attention that [she] made three (3) different errors on three (3) different occasions due to lack of attention to detail in her work." (Doc. No. 176-11.)

*See Mitchell v. McNeil*, No. 09-22866-CIV, 2010 WL 3222114, at *3-5 (S.D. Fla. 2010) (striking irrelevant evidence submitted by plaintiffs in opposition to summary judgment).

### 3. Affidavit of Marquita Johnson

Marquita Johnson, a former Sejin employee, provided a verified affidavit which was submitted by Ross as Exhibit L (Doc. No. 174-12) and by Russell as Exhibit O (Doc. No. 176-15 at 1). Sejin urges the court to strike the affidavit as irrelevant and inadmissible speculation. (Doc. No. 178 at 9-13; Doc. No. 181 at 11-14.) Ross and Russell defend the affidavit as a narrative of the "discrimination regarding Count 1" witnessed by Johnson. (Doc. No. 198 at 7; Doc. No. 197 at 10.) Ross further states that Johnson was an administrative assistant with access to internal information. (Doc. No. 198 at 7.)

The undersigned finds no relevance in the Johnson affidavit to the claims at issue here. The affidavit does not address any matter related to any plaintiff's claims regarding discrimination in the attendance point system, wage calculation, or leave availability. Rather, the affidavit discusses Johnson's complaints of discrimination and conclusory statements regarding the hiring of Koreans as managers and the disparity in "privileges" between the Koreans, African Americans and Caucasians. As the undersigned previously noted, "conclusory allegations without specific supporting facts have no probative value*." Jefferson*, 891 F.3d at 927. Hence, Sejin's motions to strike this exhibit are due to be granted.

### B. Motions for Summary Judgment

Title VII of the Civil Rights Act of 1964, as amended, provides "[i]t shall be an unlawful employment practice for an employer . . . to fail to refuse to hire or to discharge

any individual, other otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). "This provision forbids 'disparate treatment' of, or 'intentional discrimination' against, employees on the basis of race or national origin." *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 920 (11th Cir. 2018) (quoting *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, ___ U.S. ___, 135 S. Ct. 2028, 2032 (2015)).

Section 1981 prohibits racial discrimination in the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. *See* 42 U.S.C. § 1981(a), (b). "Although § 1981 does not itself use the word 'race,' the [Supreme] Court has construed the section to forbid all 'racial' discrimination in the making of private as well as public contracts." *Saint Francis Coll. v. Al-Khazraji*, 481 U.S. 604, 609 (1987) (citation omitted). Section 1981 thus creates a substantive statutory remedy for employment discrimination. *See Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 459-60 (1975) ("§ 1981 affords a federal remedy against discrimination in private employment on the basis of race"). Generally, § 1981 is similar to, though independent from, Title VII. So much so that "[t]he analytical framework and rules about employer liability under Title VII and § 1981 are the same." *Ash v. Tyson Foods, Inc.*, 664 F.3d 883, 904 (11th Cir. 2011). *See Ferrill v. Parker Grp., Inc.* 168 F.3d 468, 472 (11th Cir. 1999) ("The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases.").

Nonetheless, the plaintiffs' claims under § 1981 are limited to racial discrimination because courts have held that § 1981 does not provide a remedy for discrimination based upon national origin. The statute guarantees "[a]ll persons . . . the right … to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). "By its very terms, § 1981 applies to claims of discrimination based on race, not national origin." *Tippie v. Spacelabs Medical, Inc*., 180 F. App'x 51, 56 (11th Cir. 2006); *see also Saint Francis Coll*., 481 U.S. at 613 (holding claims based on race, "rather than solely on the place or nation of his origin," are supported under § 1981).

In order to survive summary judgment, a plaintiff alleging intentional discrimination must present sufficient facts to permit a jury to rule in her favor." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1220-21 (11th Cir. 2019). "A plaintiff may prove race discrimination through either direct or indirect evidence." *Chapter 7 Trustee v. Gate Gourmet, Inc*., 683 F.3d 1249, 1257 (11th Cir. 2012) (citing *Crawford v. Carroll*, 529 F.3d 961, 975-76 (11th Cir. 2008)). Absent direct evidence, "[c]ourts assess circumstantial evidence of discrimination through the three-part burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Burke-Fowler v. Orange Cty*., 447 F.3d 1319, 1323 (11th Cir. 2006). Under the framework established for Title VII race discrimination and national origin claims, "the plaintiff bears the initial burden of establishing a *prima facie* case of intentional discrimination by showing (1) that she belongs to a protected class, (2) that she was subjected to an adverse employment action,

(3) that she was qualified to perform the job in question, and (4) that her employer treated 'similarly situated' employees outside her class more favorably." *Lewis*, 918 F.3d at 1220-21; *Tamba v. Publix Super Mkt.*, 836 F. App'x 765, 771 (11th Cir. 2020) (applying *McDonnell Douglas* framework to race and national origin discrimination claims under Title VII and discrimination claims under § 1981); *Abbes v. Embraer Services, Inc.*, 195 F. App'x 898, 900 (11th Cir. 2006) (citing *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003)).   When a plaintiff makes her *prima facie* case of discrimination, a presumption of unlawful discrimination is created, but "the employer can rebut that presumption by articulating one or more legitimate non-discriminatory reasons for its action." *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1264 (11th Cir. 2010).   If the defendant proffers a non-discriminatory reason, the burden returns to the plaintiff, who must show that the proffered reason is pretextual. *Id.*

Sejin asserts that the plaintiffs have not established a *prima facie* case of discrimination because they have not shown an adverse action or favorable treatment of a comparable employee.   The undersigned agrees.

The plaintiffs submit identical arguments in their effort to satisfy the adverse employment element.   Each states:

> Defendants fail to mention before this honorable court that not only did the Plaintiff file her EEOC complaint on or about June 27, 2016 but also filed a retaliation claim with the company on or about November 2017, due to the fact that she was sexually and verbally harassed, then laid off.   As a continued punishment for her EEOC complaint she was not brought back to work in a similar position, but put in a position, that required extreme physical manual labor.   Defendant's counsel failed and purposely avoided any question in the plaintiff's deposition regarding the sexual harassment, nor asked or [sic] any questions regarding retaliation.   Defendant's counsel worked diligently to

give this honorable court the impression that [plaintiff] did not have any disciplinary actions.

Disciplinary actions are not a requirement of retaliation and retaliatory conduct is actionable if the "challenged actions are ones that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity." (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).) More so at the time the Plaintiff also states that there was no Korean/Asian employees on the assembly line when she was placed in [an] extreme physical manual labor position.

(Doc. No. 161 at 39; Doc. No. 167 at 54; Doc. No. 173 at 23-24; Doc. No. 175 at 33-34.)

The plaintiffs' arguments contain a crucial flaw. They are not proceeding under claims of retaliation such as those addressed in *Burlington Northern*,[14] but under a disparate treatment claim. (Doc. No. 51 at 18.) Given this court's earlier ruling that the plaintiffs could proceed <u>solely</u> on their disparate treatment claims, the plaintiffs must meet their initial burden by showing an adverse employment action resulting from differential treatment caused by Sejin's application of disciplinary rules for attendance, the calculation of wages or leave eligibility. (*Id.*) The plaintiffs' argument and evidence in support thereof do not satisfy their burden.

"A plaintiff establishes a prima facie case of disparate treatment by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class." *Arrington v. Ala. Power Co.*, 769 F. App'x 741, 747 (11th Cir. 2019) (quoting

---

[14] *See Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) (explaining that Title VII "protects an individual not from all retaliation, but from retaliation that produces an injury or harm.").

*Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004)); *Tamba*, 836 F. App'x at 771.  This means that plaintiffs must "establish an 'adverse employment action' by proving that a decision of the employer 'impact[ed] the terms, conditions, or privileges of [her] job in a real and demonstrable way.' " *Jefferson*, 891 F.3d at 920-21 (quoting *Davis v. Town of Lake Paek*, 245 F.3d 1232, 1239 (11th Cir. 2001)).  Here, the plaintiffs have not shown that they suffered "a <u>serious and material</u> change in terms, conditions, or privileges" of their employment through Sejin's relevant policies.  *Jefferson, id*. at 921. No plaintiff established that the terms or conditions of her employment were materially changed through the attendance policy or in calculation of wages or leave eligibility.  The undersigned addresses the evidence submitted by each plaintiff below.

Ross did not identify any adverse action by Sejin in her attendance, wage calculation, or leave.  She never received a warning about her attendance.  (Ross. Dep. Tr. at 65, 72.)  She did not recall submitting a leave request that was denied.  (*Id*. at 77.)  She was paid for the time she worked.  (*Id*. at 57-58.)  Review of Ross' deposition transcript establishes that she tried to give meaningful responses to the questions posed by Sejin and to articulate some actionable harm, even though she admitted at the end that she merely felt that Sejin discriminated against her.  (*Id*. at 112.)  However, "[f]eelings are not evidence.  Without an objectively reasonable basis for those feelings, they are irrelevant." *Hines v. Hillside Children's Center*, 73 F. Supp. 2d 308, 318 (W.D.N.Y. 1999) (quoting *Wado v. Xerox Corp*., 991 F.Supp. 174, 203 (W.D.N.Y. 1998)).

Bledsoe, Pearson and Russell also failed to establish any adverse employment action in regard to attendance discipline, wages or leave.  Each had a striking inability to recall facts related to their claims during their depositions.

Bledsoe has not shown any evidence that she was not paid for hours she worked. (Bledsoe Dep. Tr. at 26-27.)  She was never disciplined for violating the attendance policy, Sejin approved her requests for time off on numerous occasions, and she remembered filing a complaint through her supervisor but could not recall the content of the complaint.  (*Id.* at 27, 42-56, 40-41, 58.)

Pearson provided no factual basis for her contention that Sejin did not pay her correctly.  (Pearson Dep. Tr. at 105-109.)  She presented no facts to support her claim that Sejin had dual and unequal systems of leave and attendance policies for Korean and non-Korean employees.  (*Id.* at 109-111.)  She asserted that she was discriminated against on many occasions but did not provide a factual basis for her assertions.  (*Id.* at 125-128.)  She failed to identify any discriminatory conduct by Sejin that harmed her, or any identifiable benefit that she lost due to any discrimination she experienced while at Sejin.  (*Id.* at 162-164.)

Finally, Russell failed to provide any evidence of an adverse employment action due to Sejin's attendance policies, wage calculation, or leave policies.  Not only did she repeatedly fail to identify any adverse action due to these policies, but she repeatedly claimed memory lapses or a lack of understanding on key points related to her claims. (Russell Dep. Tr. at 59, 63-66, 122.)  When Russell was directly asked to relate the facts underlying her claims, she repeatedly asked that the question be rephrased, or responded

that she could not be sure of her claims because the documents being read by Sejin were copies.[15]  (*Id*. at 116-118.)

Even if the plaintiffs could identify an adverse action, they have not established a *prima facie* case because they fail to identify similarly situated comparators.  *Flowers v. Troup Cty., Ga. Sch. Dist*., 803 F.3d 1327, 1340 (11th Cir. 2015).  Only Ross identified specific Korean employees as comparators during her deposition,[16] and the evidence before the undersigned shows that she has not established that those individuals were similarly situated.

An employee "must prove that he and his comparators are 'similarly situated in all material respects.' "  *Tamba*, 836 F. App'x at 771.  Additionally, the employee and comparator "must have been engaged in the same basic conduct and subjected to the same work rules."  *Id*.  Here, Ross named as comparators Soo Hwa Kim and Mikyeong Kweon.  Kim is not similarly situated to Ross because Kim was a salaried employee while Ross was an hourly employee.  (*See* Doc. No. 153-10 at 6, ¶ 14.)  As to Kweon, Ross testified that Kweon functioned as her supervisor and Ross "believe[d] she was hourly."  (Ross. Dep. Tr. at 69-70.)   Yet, Ross also admitted that she did not know Kweon's personnel classification.  (*Id*. at 69.)  Because Kweon was Ross' supervisor and her status as an hourly

---

[15] Russell claimed that she could not answer the questions posed by Sejin because the documents were copies of the original and she could not be certain of the accuracy.  (Russell Dep. Tr. at 62, 115, 117-18.)

[16] The other plaintiffs only speculated that unidentified Korean employees were treated favorably.  In this Circuit, "conclusory allegations without specific supporting facts have no probative value*." Jefferson*, 891 F.3d at 927.

employee has not been established, Ross has not established that Kweon was similarly situated to her.[17]

Accordingly, in consideration of all the evidence before the undersigned, viewed in the light most favorable to the plaintiffs, the undersigned concludes that Sejin's motions for summary judgment are due to be granted.

## V.   **CONCLUSION**

For the foregoing reasons, it is the RECOMMENDATION of the undersigned that:

1.     Plaintiffs' Motions in Opposition of Defendant Sejin America, Inc.'s Motion for Summary Judgment (Docs. No. 160, 163, 166, 169) be construed as responses in opposition to Sejin's motions summary judgment.

2.     Defendant's Motion for Summary Judgment against Plaintiff Naquita Bledsoe (Doc. No. 148) be GRANTED.

3.     Defendant's Motion for Summary Judgment against Plaintiff Latoya Pearson (Doc. No. 150) be GRANTED.

4.     Defendant's Motion for Summary Judgment against Plaintiff Jessica Ross (Doc. No. 152) be GRANTED.

5.     Defendant's Motion for Summary Judgment against Plaintiff La'Ebbonie Russell (Doc. No. 154) be GRANTED.

6.     Defendant's Motion to Strike, or in the Alternative, Notice of Objections as to Plaintiff Ross (Doc. No. 178) be GRANTED.

---

[17] Paek explained there were no Korean employees comparable to the plaintiffs in assignments or pay status.  (Doc. No. 153-11 at 4, ¶ 11.)  The plaintiffs have provided no evidence to the contrary.

7.     Defendant's Notice of Objections, or in the Alternative, Motion to Strike as to Plaintiff Russell (Doc. No. 181) be GRANTED.

It is further

ORDERED that **on or before March 18, 2022**, the parties may file an objection to the Recommendation. The parties must specifically identify the factual findings and legal conclusions in the Recommendation to which they object.  The parties are advised that frivolous, conclusive, or general objections will not be considered.  This Recommendation is not a final order and, therefore, it is not appealable.

Failure to file a written objection to the Magistrate Judge's findings and recommendations in accordance with the provisions of 28 U.S.C. § 636(b)(1) shall bar a party from a *de novo* determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of the party to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  11th Cir. R. 3-1; *see Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

DONE this 3rd day of March, 2022.

JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE